Redler Conveyor Company v. Commissioner.
Redler Conveyor Co. v. Commissioner
Docket No. 75929.
United States Tax Court
T.C. Memo 1961-82; 1961 Tax Ct. Memo LEXIS 266; 20 T.C.M. (CCH) 371; T.C.M. (RIA) 61082; March 27, 1961
*266 Redler Conveyor Company held certain patents. It entered into agreements with other corporations concerning these patents. Held, the agreements were licenses and the amounts received thereunder constituted royalty and, therefore, personal holding company income. Edmund Burke, Esq, and John T. Powell, Esq., 60 State St., Boston, Mass., for the petitioner. Frank V. Moran, Jr., Esq., for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: The respondent determined deficiencies in petitioner's income tax and additions thereto as follows: Deficiency
(Personal
Additions to
Holding
the Tax
Taxable Year
Company
Section
Ended
Surtax)
291(a)
Nov. 30, 1939
$15,024.16
$3,756.04
Nov. 30, 1940
17,113.27
4,278.32
Nov. 30, 1945
6,601.61
1,650.40
Nov. 30, 1946
7,010.92
1,752.73
Respondent now concedes petitioner's failure to file personal holding company returns for the years involved was due to reasonable cause and therefore there are no additions to tax due under section 291, Internal Revenue *268 Code of 1939. Redler Conveyor Company, a subsidiary of Pneumatic Scale Corporation, Limited, owned certain patent rights. The subsidiary entered into several patent licensing agreements with third parties and later transferred patents to the parent corporation. The only question now remaining [1] is whether amounts received by Redler Conveyor Company during the taxable years ended November 30, 1939, 1940. 1945 and 1946 constituted personal holding company income. Findings of Fact All of the other facts have been stipulated and they are accordingly found. Petitioner, Redler Conveyor Company, hereafter called Redler, is a Massachusetts corporation and the wholly-owned subsidiary of Pneumatic Scale Corporation, Limited, hereafter called Pneumatic. It kept its books and filed its income tax returns on the accrual method of accounting with a fiscal year ended November 30. Redler filed *269 its income and excess profits tax returns for the fiscal years ended November 30, 1939 and 1940, and its income, declared value excess profits and excess profits tax returns for the fiscal years ended November 30, 1945 and 1946 with the then collector of internal revenue for the district of Massachusetts at Boston, Massachusetts. It did not file personal holding company tax returns for any year during the period here involved. Redler owned certain patents upon conveyor belt devices. On its income tax returns for the years in question it listed itself in business as "Grantors of Licenses on Conveyors." In November 1932 Redler entered into an agreement with Stephens-Adams Mfg. Co. of Aurora, Illinois (hereafter sometimes called Stephens-Illinois). The agreement recited that Redler was the owner of certain described U.S. patents and that Stephens-Illinois was "desirous of acquiring a license for the manufacture and sale * * *" of conveyors and parts under the patents. The agreement granted Stephens-Illinois a "nonassignable license to manufacture * * *" conveyors and parts under the license and to use and sell them "in all fields and for all purposes, except for handling fuel and *270 ash in the domestic heating field, and except also for use upon or in connection with vessels under foreign registry * * *." Redler also agreed that it would grant no other licenses during the period of the agreement except licenses for the manufacture, use or sale of the conveyors and parts for the handling of fuel and ash in the domestic heating field; a license to Pneumatic to manufacture, use or sell to the grain or flour milling industry or for use by or sale by Pneumatic to purchasers of its packaging machinery; and licenses which Redler might deem advisable for use of the conveyors and parts in connection with vessels under foreign registry. Stephens-Illinois agreed to pay Redler: during the life of this license and agreement, a royalty in amount of ten percent (10%) of the F.O.B. factory selling price of the complete conveyor and/or parts thereof, * * * to keep accurate accounts showing the number and kind of complete conveyors * * * sold, and the amount of royalty due thereon, and * * * to make written reports to Redler stating the number and kind of complete conveyors * * * sold * * * and the F.O.B. factory selling price thereof, and the amount of royalty due, and to *271 accompany such reports with payment to said Redler of the royalty then due. * * * The agreement also provided that, in addition to the royalty, Redler or its designee might have a nonexclusive right to sell conveyors manufactured by Stephens-Illinois with a commission of 15 percent of the sales price to Redler or the designee. Redler agreed to defend suits for patent infringement, to prosecute such suits against others and Stephens-Illinois agreed to cooperate with Redler without expense to Redler in the defense or prosecution of such suits. Stephens-Illinois further agreed to call to Redler's attention any or all inventions or improvements which Stephens-Illinois might make during the life of the agreement and a two-year period following its termination and to take all necessary steps to assign to Redler such inventions and improvements without expense to Redler. Stephens-Illinois further agreed to initiate production and promotion of the conveyors; to pay one-half of the operating expenses of an exhibit of the conveyor which Redler had maintained in New York; to pay one-half of the salary of Redler's chief engineer who was to approve the design and development of the conveyors *272 produced by Stephens-Illinois; to mark the finished conveyors "PATENTED" and list on them the numbers of the patents covered by the agreement which applied to them; and to mark all conveyors manufactured under the license with the trademark "REDLER". The agreement also gave Redler the right to cancel the agreement on 30 days' notice in the event of failure by Stephens-Illinois to comply with the terms of the agreement. The agreement was to terminate in December 1933, but it was subsequently extended to the end of December 1934. On December 29, 1934 Redler and Stephens-Illinois entered into a five-year license agreement concerning the U.S. patents involved in the 1932 agreement and others issued later. The 1934 agreement and others issued later. The 1934 agreement was substantially similar to the 1932 agreement, except: it granted Stephens-Illinois an exclusive license without the right to sublicense thereunder; Redler could grant an assignable nonexclusive license to Pneumatic to sell conveyors and parts to Pneumatic's packaging machinery customers; the manner of computing the amounts of the royalties was changed and Stephens-Illinois agreed to pay a minimum royalty of at least $10,000 *273 the first year, which was to increase to at least $30,000 in the fifth year; the addition of an arbitration clause; and the agreement was to inure to the benefit of and be binding upon the successors and assigns of the parties except that Stephens-Illinois agreed not to assign the license unless it was in connection with the sale of all or substantially all of its assets. In August 1936 Redler, Stephens-Illinois and Stephens-Adamson Mfg. Co. of Canada, Limited, (the latter will hereafter sometimes be called Stephens-Canada) entered into an exclusive license agreement without the right to sublicense relating to various Canadian patents controlled by Redler. The agreement was substantially similar to the 1934 agreement, except that Redler retained only use in connection with vessels of foreign registry and except that the amounts of the royalties differed. Stephens-Canada agreed to pay a royalty based on a percent of the sales price or a minimum royalty of $400 for each of the years 1936 through 1939. In September 1938 Redler and Stephens-Illinois terminated their 1934 agreement and entered into one covering the patents concerned in the prior agreement and others issued since that *274 date. In the 1938 agreement Redler granted to Stephens-Illinois an exclusive license, without the right to sublicense except by the written consent of Redler, to manufacture, use and sell conveyors and parts under Redler's patents. Excepted from the grant were: a license for the handling of fuel and ash in connection with the heating of buildings, which, the agreement stated, had been granted by Redler to Westinghouse Electric & Mfg. Co.; and the use of the patents in connection with vessels of foreign registry and for nonexclusive licenses to Pneumatic for the manufacture, use, lease and sale by Pneumatic to its machinery customers. Stephens-Illinois agreed to pay Redler "a royalty in the amount of ten per cent (10%) of the F.O.B. factory selling or lease price * * *" of conveyors or apparatus covered by the patents manufactured by Stephens-Illinois. The agreement gave Redler the privilege to cancel the license should the royalties payable fall below certain specified amounts. This agreement also contained a provision similar to that found in the others that Stephens-Illinois would make prompt disclosure to Redler of inventions and improvements to the patents covered by the license *275 and take specified steps to vest such improvements in Redler. The agreement provided that in the event Stephens-Illinois should be adjudicated a bankrupt or should make an assignment for the benefit of creditors, the license would be canceled. Redler agreed to undertake the defense of any patent infringement suits arising from patents included in the agreement brought against Stephens-Illinois or any of its customers and Stephens-Illinois agreed to pay Redler expenses incurred in prosecuting others for infringement of the patents. The agreement was to continue for 25 years from its date. In 1939 Redler, Stephens-Illinois and Stephens-Canada terminated their 1936 agreement and entered into a new one substantially similar to the 1939 agreement between Redler and Stephens-Illinois, described above, with the exception of differing royalty terms. In January 1945 Redler and Stephens-Illinois terminated their 1938 agreement and on the same day entered into a new agreement covering prior patents and others subsequently obtained. The terms of the 1945 license agreement were substantially similar to those of the prior agreements between the two parties, except that the basis on which royalties *276 were to be determined was altered, and that the term of the agreement was to be for the life of the latest patent included thereunder but not exceeding 19 years. In March 1945 Redler and Stephens-Canada terminated their 1939 agreement and entered into a new one substantially similar to the 1945 agreement between Redler and Stephens-Illinois, described above, except for different royalty terms. In February 1950 Redler and Pneumatic entered into an agreement by which Pneumatic agreed to use its best efforts to cause Stephens-Illinois to pay Redler $33,500 in return for which payment Redler agreed to release and discharge Stephens-Illinois and Stephens-Canada from all claims and demands; to cancel the 1945 license agreements with Stephens-Illinois and Stephens-Canada; assign to Stephens-Illinois its right, title and interest in any and all trademarks, trade names, trademark registrations and applications, assignable agreements, good will and patent applications and licenses possessed by Redler except a license and agreement relating to "Barnsdale Cooking Apparatus"; and to assign to Stephens-Illinois all right, title and interest in an agreement between Redler and Link Belt Company *277 and in an agreement with Leland G. Plant. On February 20, 1950 Pneumatic entered into an agreement with Stephens-Illinois and Stephens-Canada which provided that Pneumatic would cause Redler upon payment of $33,500 to release Stephens-Illinois and Stephens-Canada from all claims, to cancel the 1945 license agreements, to make the assignments detailed above in the Redler-Pneumatic agreement and to transfer and assign to Stephens-Illinois, with warranty of title certain patents. In return for this, Stephens-Illinois agreed to pay Pneumatic a consideration of $316,000. In February 1950 Redler and Stephens-Illinois and Stephens-Canada canceled their 1945 license agreements. On February 27, 1950 an adjourned meeting of Redler's board of directors was held. At this meeting it was voted that Redler distribute to its sole stockholder, Pneumatic, the United States and Canadian patents still in effect, among which were those which had been the subject of the licensing agreements described above between Redler and Stephens-Illinois and Stephens-Canada. Redler distributed the patents to Pneumatic by an assignment dated February 28, 1950. On March 2, 1950 Pneumatic assigned the patents *278 to Stephens-Illinois pursuant to the February 20 agreement for a consideration of $316,000. During the lives of the patents, to February 27, 1950, Redler claimed depreciation on them on its income tax returns. On its tax return for 1939 Redler reported $46,592.18 as income from royalties. Of this amount $45,046.77 was derived from payments by Stephens-Illinois under the 1938 agreement; $607.45 was derived from payments under the 1936 agreement with Stephens-Canada and $937.96 was derived from payments under the 1939 agreement with Stephens-Canada. A revenue agent audited Redler's 1939 tax return. As a result of his report, received in 1940, income from the Canadian corporation under the 1939 agreement was increased by $298.07. On its tax return for 1940 Redler reported royalty income of $51,719.11. Of this amount $48,131.35 was derived from payments under the 1938 agreement with Stephens-Illinois and $3,587.76 was derived from the 1939 agreement with Stephens-Canada. On its tax return for 1945 Redler reported royalty income of $43,281.43. Of this amount $40,521.53 was derived under the 1945 agreement with Stephens-Illinois and $2,759.90 under the 1945 agreement with Stephens-Canada. *279 A revenue agent audited Redler's 1945 tax return. As a result of his report dated March 27, 1947, income derived under the agreement with Stephens-Illinois was reduced by $382.08. On its tax return for 1946 Redler reported royalty income of $64,053.66. Of this amount $57,991.60 was derived from payments under the 1945 agreement with Stephens-Illinois and $6,062.06 from the 1945 agreement with Stephens-Canada. In the statutory notice respondent determined that Redler was a personal holding company as defined in section 402 of the Revenue Act of 1938 and section 501, Internal Revenue Code of 1939, and was, therefore, liable for the surtax on personal holding companies under section 401 of the Revenue Act of 1938 and section 500, Internal Revenue Code of 1939, for the years 1939, 1940, 1945 and 1946. Opinion The single issue is whether the payments received by Redler under the agreements with Stephens-Illinois and Stephens-Canada during the years 1939, 1940, 1945 and 1946 were royalties and, accordingly, constitute personal holding company income under section 403, Revenue Act of 1938 and section 502 of the Internal Revenue Code of 1939. [2]
*280 The agreements are in form licensing agreements providing for "royalty" payments to Redler and Redler during said years reported the income received as royalty and ordinary income. However, Redler now contends the agreements are assignments and the proceeds received under the agreements represent the proceeds from the sale of capital assets and, accordingly, are not personal holding company income. The question comes down to whether the agreements between Redler and Stephens-Illinois and Stephens-Canada represent assignments of the patents referred to therein or mere licenses. The four agreements to be considered are those of 1938 and 1945 between Redler and Stephens-Illinois and those of 1939 and 1945 between Redler and Stephens-Canada. The agreements prior to 1938 between Redler and the two Stephens companies are clearly licensing agreements. We have described them in our findings and we need not discuss the retention of rights by Redler in those agreements. The fact that they were for a term of years less than the remaining lives of the patents covered thereunder (17 years in the United States and 18 years in Canada) is sufficient to establish they were not agreements of sale *281 and were mere licenses. Lynne Gregg, 18 T.C. 291, affd. 203 F. 2d 954; Arthur M. Young, 29 T.C. 850, affd., 269 F. 2d 89. It is significant that Redler concedes that $607.45 of the amount it reported in 1939, which was derived from the 1936 agreement with Stephens-Canada, was royalty. The four agreements with the Stephens companies of 1938, 1939 and 1945 were clearly intended to be licensing agreements. The following is from the 1938 agreement with Stephens-Illinois: 2. Licensor hereby, in all fields and for all purposes excepting for the license for the handling of fuel and ash in connection with or incidental to the heating of buildings heretofore granted by Licensor to Westinghouse Electric & Mfg. Co., and excepting also for the use upon or in connection with vessels of foregin registry, and excepting also for such non-exclusive license or licenses to Pneumatic Scale Corporation, Limited, a Massachusetts corporation, of Quincy, Massachusetts, hitherto granted or which may hereinafter be granted by Licensor to said Pneumatic Scale Corporation, Limited for the manufacture, use, lease and sale of conveyors and/or parts thereof *282 for use by or sale to its present and/or future customers of machinery for use in connection with said machinery, and subject to said exceptions grants to Licensee the exclusive license, without the right to sublicense excepting with written consent of Licensor, to manufacture, use and sell conveyors and/or conveying apparatus and/or parts thereof under the United States Letters Patent and/or applications * * * and under any other United States Letters Patent and/or applications for United States Letters Patent relating to conveyors which Licensor may now or during the continuance of this license own or control. Subsequent clauses of this agreement provided Stephens-Illinois pay "a royalty" in the amount of 10 percent of the factory selling or lease price with a minimum annual royalty of $40,000 during the first three years and $30,000 during the succeeding years, with the right in Redler to cancel for nonpayment of royalties. Redler was also given the right to cancel in the event of the licensee's bankruptcy or assignment for the benefit of creditors. It retained much control over the prosecution of infringement suits. The 1938 agreement further provided that: Licensee shall not *283 have the right to prosecute any litigation against others for infringement * * * without first having obtained the written consent of Licensor so to do. The agreement contained a provision that the licensee make prompt disclosure of all inventions or improvements made by the licensee or its employees which relate to conveyors and it obligated the licensee to take all steps to vest title to such improvements, inventions, patents or applications for patents in the licensor. The licensee was required to keep accurate and complete accounts, render monthly statements, and exhibit its books to Redler. The agreement was to continue for 25 years from its date. The other three contracts were almost identical as to the pertinent terms except that the 1939 contract with Stephens-Canada had different minimum royalty terms and the 1945 agreements, which canceled the 1938 and 1939 agreements, altered the basis on which the royalty was to be determined and changed the term to the life of the latest patent but not exceeding 19 years. It is obvious licenses were intended. This is made manifest by the license language of all of the agreements, the fact that all of the clauses of the agreements are *284 consistent with their being licenses, the fact that Redler reported all receipts as royalty and ordinary income and the strange maneuvers in 1950 whereby the 1945 agreements were canceled and the patents transferred by Redler to its parent Pneumatic and then assigned by Pneumatic to Stephens-Illinois. There are cases where the granting clause in the patent agreement is so broad that in legal effect it is an assignment even though the parties call it a license and the payments thereunder royalties. Petitioner cites such authorities but they are clearly not in point. Here the intended license contracts contain numerous restrictions and limitations on the grant, and provisions for the licensor to retain rights in the patent. Here there are limitations on the grant restricting the scope in which they may be used, such as in the building heating industry, and in connection with vessels of foreign registry. Actually, the granted licenses were nonexclusive for the contracts recite licenses were in existence to its parent Pneumatic and in the agreements Redler retained the right to issue future licenses to Pneumatic. Then there are the clauses that give to Redler the title to improvements *285 that licensee might develop and patent, and clauses restricting licensees' assignment rights, limiting the granting of sublicenses, and limiting the licensees' right to prosecute infringement suits. All of these clauses are perfectly consistent with the intention to give licenses to the Stephens companies and inconsistent with any intention to transfer the patents. It is the intention that governs and "the instrument of transfer must be unambiguous and show a clear and unmistakable intent to part with the patent." Kenyon v. Automatic Instrument Co., 160 F. 2d 878. Petitioner cites other authorities where intended assignments contained provisions that tend to limit the grant somewhat and where it was held under certain circumstances such clauses did not defeat the assignments. Such cases are obviously not in point for as stated earlier no assignments were intended in the instant case. We hold the amounts received by Redler under the agreements with the Stephens companies during the years 1939, 1940, 1945 and 1946 constituted personal holding company income. Decision will be entered under Rule 50. Footnotes
1. Pneumatic Scale Corporation, Limited, was a petitioner before this Court in Docket No. 75927. Said docket was consolidated with this one for trial and opinion. Since trial all issues in Docket No. 75927 have been settled by stipulation of the parties and decision subsequently entered thereon.↩
2. Sections 401 of the Revenue Act of 1938 and 500 of the Internal Revenue Code of 1939 provide for the levy of surtaxes upon income of personal holding companies. Sections 402 of the Revenue Act of 1938 and 501 of the Internal Revenue Code of 1939 define a personal holding company as any corporation, at least 80 percent of the income of which is personal holding company income as defined in section 403 of the Revenue Act of 1938 and section 502 of the Internal Revenue Code of 1939↩. The latter two sections define personal holding company income as meaning the portion of the gross income "which consists of * * * royalties."